**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**


**WILLIE B. SMITH,**

      **Plaintiff,**

**vs.**                                                    **Case No. 4:11cv573-RH/CAS**

**MORRIS A. YOUNG, SHERIFF**
**OF GADSDEN COUNTY, FLORIDA,**

      **Defendant.**

_____/


## REPORT AND RECOMMENDATION

      Defendant filed a motion for summary judgment, doc. 49, supported by a

statement of undisputed facts, *Id.* at 4-8, and supporting evidence, doc. 50.  The pro se

Plaintiff was advised of his burden in opposing summary judgment, doc. 52, and

Plaintiff has belatedly filed a response to the motion, doc. 57, and an additional sworn

affidavit, doc. 58.  Although beyond the summary judgment deadline, *see* doc. 54, the

documents are accepted.

      While in the course of the Court's review of the summary judgment materials,

Defendant filed a motion to strike and a motion for sanctions against Plaintiff.  Doc. 59.

That motion is not addressed in this report and recommendation.  Plaintiff shall have

fourteen days from the date of service in which to respond to Defendant's motion.  N.D.

Fla. Loc. R. 7.1(C)(1).  Plaintiff is warned that failure to file a response "may be

sufficient cause to grant the motion."  *Id.*

**Allegations of the Amended Complaint, doc. 37**

In this Title VII action, Plaintiff alleged that he was employed by the Gadsden County Sheriff's Office between June 8, 2007, and January 11, 2010. Doc. 37 at 3. Plaintiff contends the Defendant discriminated against him because of his gender, race, and age when Defendant terminated his employment, failed to transfer Plaintiff to another position, and retaliated against Plaintiff. *Id.* Plaintiff alleged that he filed charges against the Defendant on June 29, 2010, and that the EEOC issued a Notice of Right to Sue[1] dated August 15, 2011, but which was not received by Plaintiff until October 15, 2011. *Id.*

Plaintiff alleged that while employed by the Defendant, he submitted Letters of Interest for various open positions in July 2005; January 2006; June 2006; June 2007; January 2008; and June 2008. Doc. 37 at 5. Despite having been told that upcoming positions would be filled from within the Office, Plaintiff was not hired into the positions and they were given to new applicants, some of whom were young, female, and white. *Id.* Plaintiff alleges that he was "turned down for approximately 20 positions when" a "qualifying exam" was used on or about September 17, 2009. *Id.* at 5.

Plaintiff alleges that after he filed a complaint in October 2009, he was retaliated against by an investigation into an anonymous citizen's complaint. *Id.* at 5. Plaintiff contends the investigation was unfair because the caller was not identified, the investigator assigned to Plaintiff's unit was not assigned to the investigation, Plaintiff was not permitted any type of hearing, and he was also charged with perjury. *Id.*

---

[1] Plaintiff did not attach copies of those documents to the amended complaint, but they were submitted with the initial complaint. Doc. 1 at 9-11.

Plaintiff also claims he was not provided Post Orders or Policy and Procedure for his position, was given "subpar" firearms training, and wrongfully investigated concerning a civil issue. *Id.* at 5-6. Plaintiff claims further retaliation with a re-introduced disciplinary charge which Plaintiff contends was fraudulent, and led to his termination. *Id.* at 6. Plaintiff claims there was unfair bias by the Board which terminated his employment because Plaintiff had filed a complaint against Morgan, but he participated in the Board's decision. *Id.* at 6. Plaintiff alleged that other persons were not terminated for similar misconduct. *Id.*

**Motion for Summary Judgment, doc. 49**

Defendant asserts that all of the claims except for one (September 2009 application for a deputy sheriff's position) are untimely and are barred by the statute of limitations. Doc. 49 at 1. Defendant also contends that Plaintiff fails to make a prima facie case of discrimination because the denial of a lateral transfer does not constitute adverse job action, *Id.* at 2, nor do Plaintiff's claims that he was provided substandard firearms training or not provided post-order or policies establish adverse job action. *Id.* at 3. Further, it is argued that Plaintiff fails to establish that similarly situated persons outside Plaintiff's protected class were treated differently or more favorably than Plaintiff. *Id.* at 2-3. Defendant also asserts legitimate, nondiscriminatory reasons for Plaintiff's termination and contends Plaintiff cannot show the reasons were pretextual. *Id.* at 3. Finally, Defendant maintains that Plaintiff's retaliation claim cannot survive because he cannot show protected activity, or causation. *Id.* at 3-4.

**Legal standards governing a motion for summary judgment**

On a motion for summary judgment, the Defendant initially has the burden to demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corporation v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2553-54, 91 L. Ed. 2d 265 (1986). If accomplished, the burden shifts to Plaintiff to come forward with evidentiary material demonstrating a genuine issue of material fact for trial. *Id*. An issue of fact is "material" if it could affect the outcome of the case. Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004) (citations omitted). Plaintiff must show more than the existence of a "metaphysical doubt" regarding the material facts, Matsushita Electric Industrial Co., LTD. v. Zenith Radio Corporation, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of evidence is insufficient. The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Hickson Corp., 357 F.3d at 1260, *quoting* Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S. Ct. 2505, 2505, 91 L. Ed. 2d 202 (1986). All reasonable inferences must be resolved in the light most favorable to the nonmoving party, Watkins v. Ford Motor Co., 190 F.3d 1213, 1216 (11th Cir. 1999), if there is a genuine dispute as to those facts. Scott v. Harris, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007), *cited in* Ricci v. DeStefano, 129 S.Ct. 2658, 2677 (2009). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita Elec. Industrial Co., 475 U.S. at 587 (internal quotation marks omitted), *quoted in* Ricci v. DeStefano, 129 S.Ct. at 2677.

"Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " <u>Owen v. Wille</u>, 117 F.3d 1235, 1236 (11th Cir. 1997), *cert. denied* 522 U.S. 1126 (1998), *quoting* <u>Celotex</u>, 477 U.S. at 324, 106 S. Ct. at 2553 (quoting Fed. R. Civ. P. 56(c), (e)).  The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c).  <u>Owen v. Wille</u>, 117 F.3d at 1236; <u>Celotex</u>, 477 U.S. at 324, 106 S. Ct. at 2553.

When the Order was entered advising Plaintiff of his obligation to respond to Defendant's summary judgment motion, Plaintiff was specifically informed that pursuant to the local rules of this Court, he must submit a statement of facts pointing to evidence which demonstrates there is a genuine dispute of a material fact.  Doc. 52.  Rule 56.1 of the Rules for the Northern District of Florida, was cited for Plaintiff:

> The party opposing the motion [for summary judgment] shall, in addition to other papers or matters permitted by the rules, file and serve a separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried, in the format set forth above.

> All material facts set forth in the statement [of uncontested facts] required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be filed and served by the opposing party.

N.D. Fla. Loc. R. 56.1(A), *quoted in* doc. 52 at 5.  Plaintiff was told that because Defendant had submitted a "statement of material facts as to which it is contended there is no genuine issue of fact, Plaintiff must (in addition to submitting other materials

permitted by the Federal Rules, discussed above) submit a separate statement of facts as to which Plaintiff contends there *is* a genuine issue of fact." Doc. 52, at 5, *citing to* N.D. Fla. Loc. R. 56.1(A). He was further informed that "[t]he statement must reference the 'source of the relied upon material fact, by page, paragraph, number, or other detail sufficient to permit the court to readily locate and check the source.'" *Id*. Finally, Plaintiff was advised that "[f]acts set forth in Defendants' statement will be deemed admitted (if supported by record evidence) unless controverted by Plaintiff's statement." *Id*. Despite that clear warning, Plaintiff's response to summary judgment consists of a large stack of just over 300 pages filed as document 57, and a separate two-page affidavit filed as document 58. Buried within the response is a purported statement, doc. 57 at 17-19, but which is insufficient because it does not reference any source for the asserted statements. *See* Johnson v. Chase, 5:06cv377, 2008 WL 4377361, at *2 (M.D. Ga. Sept. 25, 2008) (noting that a self-serving affidavit, photocopies from unidentified sources, and the failure to submit a statement of undisputed materials facts is insufficient to overcome defendants' motion for summary judgment).[2] Plaintiff has not pointed out to the Court any particular piece of evidence which supports his claims and creates a genuine dispute of fact and, thus, his response is insufficient.

In Joseph v. Napolitano, 839 F.Supp.2d 1324, 1329 (S.D. Fla. 2012), the court noted that a similar Local Rule 56.1 "is intended to reduce confusion and prevent the

---

[2] Plaintiff's statement also presents inaccurate facts, without providing a basis for the assertion. For example, Plaintiff contends, without providing a citation to evidence, that the "anonymous caller [whose call initiated the investigation] has never been Identified." Doc. 57 at 18. The callers were identified as Christopher Person, and his mother, Ms. Roseanne Person. Defendant's ex. 25 (doc. 50-2 at 69).

Court from having to scour the record and perform time-intensive fact searching."

Joseph, 839 F.Supp.2d at 1329.

> The rule thus reflects a clear policy that it is not the court's obligation to scour the record for a factual dispute that precludes summary judgment. Rather, it is the nonmovant's obligation to specifically bring the factual dispute to the court's attention by rebutting the movant's factual statements on a paragraph by paragraph basis and with specific citations to the record.

Id. Here, Plaintiff did not file a proper statement of material facts as to which he contends, by citation to the record, that there are facts in dispute. Thus, Defendant's statement of facts must be deemed admitted.

**Timeliness**

Plaintiff filed his complaint dually with both the E.E.O.C. and the Florida Commission on June 24, 2010. The timeliness of an employment discrimination complaint is set forth in 42 U.S.C. § 2000e–5(e)(1)[3] and generally requires an aggrieved person to file a charge alleging an unlawful employment practice within 180 days. National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109, 122 S.Ct. 2061, 2070 (2002). However, "[i]n a State that has an entity with the authority to grant or seek relief with respect to the alleged unlawful practice, an employee who initially files a grievance

---

[3] "A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred and notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) shall be served upon the person against whom such charge is made within ten days thereafter, except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier, and a copy of such charge shall be filed by the Commission with the State or local agency." 42 U.S.C. § 2000e–5(e)(1).

with that agency must file the charge with the EEOC within 300 days of the employment practice; in all other States, the charge must be filed within 180 days." Morgan, 536 U.S. at 109, 122 S.Ct. at 2070. "A claim is time barred if it is not filed within these time limits." *Id.*

Florida is a deferral state and the Florida Commission on Human Relations is charged with the authority to investigate and grant relief from alleged unlawful employment practices. E.E.O.C. v. Joe's Stone Crabs, Inc., 296 F.3d 1265, 1271 (11th Cir. 2002); Wells Fargo Guard Servs. Inc. of Florida v. Lehman, 799 So.2d 252, 253 (Fla. 3d DCA 2001). Thus, because Plaintiff filed a dual charge with both agencies, his claims are timely and may be considered only when filed within 300 days. O'Hara v. University of West Florida, No. 11-13610, 2012 WL 5392812, *1 (11th Cir. Nov. 6, 2012). The same timeliness requirement exists with respect to claims brought pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 626(d)(1), as well. Sebastian v. Universal Technical Inst., Inc., 6:11cv1597, 2012 WL 1447911, at *2 (M.D. Fla. Apr. 26, 2012). Thus, because Plaintiff filed his charge of discrimination on June 24, 2010, all claims which occurred prior to August 28, 2009, are barred. Summary judgment should be granted in Defendant's favor as to all of those claims.

The only claims left in this case concern Plaintiff's allegation that he was not hired as a deputy sheriff on or about September 17, 2009, because of the use of a "qualifying exam," that Plaintiff suffered retaliation in October 2009, and that Plaintiff's termination from the Sheriff's Office was due to discrimination. Only the evidence related to those claims will be examined in ruling on the summary judgment motion.

**The relevant Rule 56(e) evidence**

In January 2005, Plaintiff was hired by Defendant Sheriff Morris Young as a corrections officer to be stationed at the Gadsden County Jail.  Doc. 50-3 (Young affidavit).  At the time Plaintiff was hired, Defendant was aware that Plaintiff "had previously been terminated" from his position as a detention officer at the Florida State Hospital, but "decided to give him a second chance by working as a corrections officer for the Gadsden County Sheriff's Office ('GCSO')."  *Id.*

On September 11, 2006, Plaintiff requested a leave of absence from September 13, 2006, through October 31, 2006, due to a family emergency.  Young affidavit, at 1; Defendant's ex. 6 (doc. 50-2 at 11).[4]  Plaintiff said that after the leave time, he "would like to re-evaluate [his] situation, return to work or apply for additional time." Defendant's ex. 6.  When Plaintiff failed to return to his position in November 2006, following the expiration of his leave of absence, Defendant "terminated his employment for job abandonment" on January 29, 2007.  Young affidavit, at 1; Presnell affidavit (doc. 50-4 at 1).

In May or early June of 2007, Plaintiff contacted Defendant and asked to be returned to his corrections officer position.  *Id.*  Plaintiff "represented that there had been a miscommunication or misunderstanding with his supervisors regarding his failure to return to work after the leave of absence expired . . . ."  *Id.*  Defendant gave Plaintiff another opportunity to work for GCSO and he was reinstated in June 2007.

---

[4] The initial reference to an exhibit is to the paper copy and page number, followed by a reference (in parenthesis) to the corresponding document and page in the electronic docket.  Both citations are referenced as a pro se litigant will not have access to the court's electronic docket.

At Plaintiff's request, he was permitted to submit a Letter of Resignation which was provided to the Florida Department of Law Enforcement [hereinafter FDLE] stating that he was voluntarily resigning his position due to a family medical emergency. Presnell Affidavit at 1; *see* Defendant's ex. 7 (doc. 50-2 at 13). Plaintiff's Letter of Resignation was signed by Plaintiff and dated January 29, 2007. Defendant's ex. 7 (doc. 50-2 at 13). "However, [Plaintiff's] termination for job abandonment was never rescinded by the Sheriff and his status change regarding the termination remained in his personnel file." Presnell affidavit at 1; *see also* ex. 1 to Presnell affidavit (doc. 50-4). An Affidavit of Separation shows Plaintiff's separation date as January 29, 2007, and the box is checked indicated "Voluntary separation not involving misconduct." Defendant's ex. 8 (doc. 50-2 at 15).

In October 2007, Plaintiff became "dual-certified in both law enforcement and corrections." Presnell affidavit at 1. Prior to October 2007, Plaintiff was not eligible for a law enforcement position such as a deputy sheriff position within GCSO. *Id.*; *see* Defendant's ex. 3 (doc. 50-4 at 9). After obtaining the dual certification, Plaintiff was given a deputy sheriff's badge instead of a correctional officer's badge, he "received a 9-millimeter Glock that was purchased by" GCSO, new uniforms that said "Sheriff" in large yellow print, although he did not receive a pay increase. Plaintiff's deposition at 48 (doc. 50-1 at 12).[5] Plaintiff continued to work at the jail as a detention officer after obtaining the duel certification and his duties continued to relate primarily to "the care, custody, and control of inmates." *Id.* at 49-50 (doc. 50-1 at 13-14). Plaintiff testified in

_____

[5] This citation is to the printed page number of 48 from the deposition transcript, but was filed on CM/ECF as page 12 of document 50-1.

his deposition that after his dual certification, he was able to perform additional duties such as issue criminal charges against inmates. *Id.*

During the course of his employment with GCSO, Plaintiff submitted Letters of Interest for several law enforcement positions within the agency, but was not selected for the positions. Defendant's ex. 15 (doc. 50-2 at 19-29). In September of 2009, Plaintiff applied for a deputy sheriff's position. Presnell affidavit at 2 (doc. 50-4). This application process was governed by new General Order 1.0, made effective on September 1, 2009, and rescinding the prior order from August of 2005. Ex. 3 to Presnell affidavit (doc. 50-4 at 7-15). The purpose of the order was "to establish guidelines for recruiting, testing, interviewing, and hiring of employees to the Sheriff's Office." *Id.* at 1 (doc. 50-4 at 7). General Order 1.0 required all applications for positions "to perform a qualitative and/or quantitative test prior to an oral interview, which is job-specific and non-discriminatory, as determined and approved by the Human Resource Manager prior to test date." *Id.* at 4 (doc. 50-4 at 10). "Any written exam measuring knowledge or competence must be passed with a minimum score of 70% or equivalent." *Id.;* see doc. 50-4 at 10.[6] All applicants were required to achieve the "minimum performance level in order to move on to the oral interview process." *Id.* Pursuant to the requirements of the new GCSO policy, Plaintiff took the Applicant Test for the position of Deputy Sheriff on September 17, 2009. Defendant's ex. E (doc. 50-2 at 33-41). Plaintiff scored a 59 on the test, which was not a passing score. *Id.* at 33; Presnell affidavit at 2 (doc. 50-4 at 2). "Every applicant who has been appointed to a

---

[6] General Order 1.0(7)b provides: "Any written exam measuring knowledge or competence must be passed with a minimum score of 70% or equivalent." Ex. 3 to Presnell affidavit, doc. 50-4 at 10.

deputy sheriff's position since [the date the new policy became effective has] scored at least 70 on the written test.  Presnell affidavit at 2.

On or about October 7, 2009, Plaintiff submitted a letter directed to the Defendant, Sheriff Morris Young, Major James Morgan, Lieutenant Levon Jackson, and Mrs. Ann Marie Presnell (the Human Resources Manager of the GCSO).  Defendant's ex. 15 (doc. 50-2 at 19); Presnell affidavit at 1 (doc. 50-4 at 1); *see also* Plaintiff's ex. H (doc. 57-1 at 31).  Plaintiff complained that while applying for a Road Deputy position, he was "unethically placed in the position of a new recruit" and had been "requested by personnel to undergo interviews and test along with 22 perspective employees." Defendant's ex. 15 (doc. 50-2 at 19).  Plaintiff requested that he be permitted "to move into the positions of Road Deputy without competing with new recruits." *Id.*

On December 1, 2009, Presnell received a telephone call from Christopher Person, requesting verification of Plaintiff's employment.  Presnell affidavit at 2. Presnell asked if the inquiry concerned an employment reference, and Mr. Person explained that Plaintiff "had just left his mother's residence in Miami, and while dressed in a GCSO uniform, and wearing a firearm, [Plaintiff] had intimidated his mother when they were negotiating the purchase of a motor vehicle." *Id.*  Presnell confirmed Plaintiff's employment, but then she "requested Sgt. Matt Rowan to speak with Mr. Person regarding this matter." *Id.*  Presnell stated that she considered an allegation concerning a member of the GCSO threatening another person "to be a serious issue, which, if true, would constitute a violation of GCSO policy." *Id.* at 2-3.  She believed it appropriate to refer such a complaint to Sgt. Rowan as he was employed as an internal affairs investigator at the time.  *Id.* at 3; Rowan affidavit at 1 (doc. 50-5).

Rowan submitted his own affidavit in which he states that the complaint by a member of the public was properly referred to him for investigation pursuant to GCSO procedures. Rowan affidavit at 1 (doc. 50-5). After Rowan spoke with the complainant, Christopher Person, and his mother, Roseanne Person, Rowan believed that Plaintiff might have violated GCSO policy relating to misuse of his position. *Id.* Mr. Person represented to Rowan that Plaintiff "had intimidated his mother, Roseanne Person, while involved in a personal transaction related to the purchase of a motor vehicle . . . ." *Id.* Mr. Person said that Plaintiff had appeared at his "mother's home in Miami, Florida, while he was dressed in a Gadsden County Sheriff's Office law enforcement uniform, armed with a firearm and scared his mother." Attachment 1 to Rowan affidavit (doc. 50-5 at 9). Rowan spoke by telephone to Mr. Person and his mother, who "sounded agitated and upset." *Id.* Ms. Person explained that the circumstances surrounding the purchase of the vehicle were strange, that Plaintiff had called her in the middle of the night to tell her that the car he had just purchased had broken down, and he did not accept her offer to pay to have the car towed back to her home and she would refund him the money he paid to purchase the car. *Id.* at 9-10. Instead, Plaintiff contacted her several days later and said he had the car towed from south Florida to Tallahassee, and wanted some money refunded. *Id.* at 10. When Plaintiff arrived at her home on December 1, 2009, he wore his law enforcement uniform, gun belt, and was armed with his holstered pistol. *Id.* Ms. Person "said that she was frightened and intimidated by" the Plaintiff's attire and agreed to refund approximately $400.00 to Plaintiff. *Id.* Christopher Person told Rowan, "The only reason Willie Smith put on a uniform and

gun was to try to intimidate my mother into giving him more money. There's no other reason for him to wear a uniform all the way to Miami." *Id.*

Rowan briefed the Defendant Sheriff about the complaint against Plaintiff, and Defendant directed Rowan to conduct an investigation into the allegation against Smith.[7] Rowan affidavit at 1 (doc. 50-5). On December 7, 2009, Plaintiff was interviewed by Rowan and had his attorney, Ryan Hobbs, present with him to witness the interview. Rowan affidavit at 1 (doc. 50-5); doc. 50-5 at 15. Plaintiff gave a sworn statement in which he said that he "traveled November 30, 2009[,] on a Greyhound bus to meet with Roseanne Person at her residence in Palmetto Bay, Florida, to renegotiate the purchase price of a vehicle that he bought from Ms. Person on November 20, 2009." *Id.* Plaintiff said that he "wore his uniform and gun belt on the bus, with a jacket covering the shirt and gun belt for the duration of the trip." *Id.* Plaintiff told Rowan that "when he arrived at Mrs. Person's residence, he removed his jacket and carried it into the house." *Id.* Plaintiff admitted "that he was wearing his uniform and his gun when he negotiated a refund of approximately $300 as compensation for mechanical problems that he developed after he initially purchased the vehicle." *Id.* at 2. Indeed, Plaintiff said that he went to Miami the "same way" he got off work, except that he put a jacket on over his uniform. Attachment to Rowan affidavit (doc. 50-5 at 17-18). Plaintiff said when he arrived at the Person residence, he took off his jacket because it was hot and he was "sweating profusely." *Id.* at 18.

---

[7] Ms. Person reported feeling afraid of Plaintiff and did not want her name disclosed. Attachment to Rowan affidavit (doc. 50-5 at 12). She said the initial contact was made with the GCSO only to verify Plaintiff's employment, and she was "scared that he'll come back to [her] house if he thinks [she] got him in trouble or fired." *Id.*

Plaintiff said he did not take an extra set of clothes when he returned to speak with Ms. Person about the refund. Attachment to Rowan affidavit (doc. 50-5 at 23). Plaintiff also said that he never had a conversation with any of the Persons concerning having the car towed. *Id.* at 20. Plaintiff denied wearing the uniform to try and influence Mrs. Person to refund him money for the car. *Id.* at 22.

After interviewing Plaintiff, Rowan spoke with Greyhound Bus Station Manager Derrick Porter who advised that "Greyhound Bus Lines has a zero tolerance of possession of any firearm while traveling on a Greyhound Bus no matter of profession." Attachment to Rowan affidavit (doc. 50-5 at 25); *see also* Defendant's ex. 23 (doc. 50-2 at 59). Porter told Rowan that he "did not believe that an armed uniformed officer could have traveled on a Greyhound Bus without bringing attention to himself." *Id.* Porter advised Rowan that surveillance cameras were in operation at that time and invited Rowan to come to the bus station and review video tapes. *Id.*

On December 8, 2009, Rowan obtained a video from the Greyhound bus station in Tallahassee for November 30, 2009, the date Plaintiff departed for Miami (and Palmetto Bay where Ms. Person lived). Rowan affidavit at 2 (doc. 50-5). At approximately 1752 hours, Plaintiff purchased the bus ticket inside the bus station and was wearing his uniform, gun, and accompanied by his wife. Attachment to Rowan affidavit (doc. 50-5 at 25). At approximately 2000 hours, Plaintiff was walking toward his bus and boarded the bus. *Id.* at 25-26. The video contradicted Plaintiff's sworn statement during his interview and demonstrated that when Plaintiff was boarding the bus, he was "wearing a red colored shirt, carrying a duffel bag and jacket." *Id.* at 26.

Rowan re-interviewed Plaintiff on December 18, 2009, in light of the contradictions with his original sworn statement. Rowan affidavit at 2 (doc. 50-5); doc. 49 at 7; doc. 50-5 at 26.[8] Plaintiff was again accompanied by his attorney, and together, they watch the Greyhound Bus Station video surveillance tape. *Id.* at 26-27. Plaintiff "identified himself and his wife on the tape to his attorney." *Id.* at 27. When Rowan asked Plaintiff to explain the discrepancies concerning his earlier testimony about what he was wearing, Plaintiff said that he had been truthful and did not have a change of clothes with him. *Id.* at 27. Plaintiff said that before he boarded the bus, "he had his wife give him a red shirt that she had been wearing." *Id.* Plaintiff said he took "off his uniform shirt and gun-belt and put on his wife's red shirt." *Id.* Plaintiff said he put his uniform shirt and gun-belt in a tote bag and carried it with him, but Plaintiff complained that because his wife's shirt was very tight on him and he "could not even breathe in" the shirt, he put on his "regular clothes." *Id.* Plaintiff said the rest of his uniform was in the tote bag, and he said he did not "have time to go home and get a change of clothes to wear on the bus trip." *Id.* at 27. Rowan pointed out the time frames on the video which indicated that he purchased the bus ticket at approximately 1800 hours, and did not board the bus until approximately 1945 hours. *Id.* Plaintiff said that in between that nearly two hour span of time, he and his wife were at Firehouse Subs. *Id.* at 28. Plaintiff said he did not go back to his house because "traffic was very thick and I was afraid that I wouldn't have time to get back." *Id.*

_____

[8] The Rowan affidavit contains an obvious typographical error, listing the date of the re-interview as being in "2012" instead of in 2009 when the investigation was underway. Rowan affidavit at 2 (doc. 50-5). Review of the investigation file confirms the re-interview took place on December 18, 2009. Doc. 50-5 at 26.

Rowan pointed out that because Plaintiff worked the night shift, he "got off work at 7:00 in the morning." *Id.* at 28. Plaintiff said that he did not go home to change clothes during the 12 or 13 hours of the day because he was trying to get another estimate on the car transmission and he said he was not aware that he was not supposed to have his uniform on. *Id.* So when asked why he put his wife's shirt on before boarding the bus, Plaintiff said that he "did not want everybody from Tallahassee to Miami and Palmetto Bay . . . to recognize" him as an officer. *Id.* at 28-29.

When Rowan questioned Plaintiff as to when he put his uniform back on, Plaintiff first said that he was on the bus nearing Miami when he did so. *Id.* at 29. However, Rowan interjected that when people go in and out of bus stations in Miami and Orlando, where Plaintiff had to change buses, they are checked with a wand to see if a passenger "had a metal object or something on" their person. *Id.* Plaintiff then changed his story and said that he put his uniform shirt and gun-belt back on after getting off the bus and into a taxi cab to go to the Person's residence. *Id.* at 29-30.

Rowan concluded that Plaintiff violated three General Orders of the GCSO. *Id.* at 31-32; *see also* Rowan affidavit (doc. 50-5 at 2). Plaintiff was found to have violated General Order Chapter 3.0 Section 3a(19) which states, "Employees shall not use their official position to harass, threaten or coerce any person." *Id.* at 31. Because Plaintiff was off duty when he traveled over 500 miles away to negotiate the price of a vehicle, the wearing "of his official uniform for unofficial and unauthorized activities was clear misuse of his official position." *Id.* General Order Chapter 3.0 Section 3a(31) requires employees to "speak truthfully in any official proceeding, including but not limited to, criminal or civil court proceedings, depositions, administrative hearings, and

administrative investigations." *Id.* at 32. Plaintiff "was not truthful when he provided

sworn testimony during" the administrative investigation. *Id.* Finally, General Order

Chapter 3.0 Section 3a(36) prohibits employees from engaging "in any conduct that

constitutes a gross violation of conduct unbecoming an officer, or any act that is likely to

severely affect the discipline, good order, or reputation of the agency or that will

compromise the integrity of the employee." *Id.* Plaintiff was found to have severely

affected his own reputation, the reputation of the GCSO, and he compromised his own

integrity. *Id.* The second and third charged violations were "level five" violations.

Defendant's ex. F (doc. 50-2 at 92).[9]

　　　Defendant Young stated in his affidavit that the "investigation sustained

violations of agency policy" and the Defendant "decided to terminate" Plaintiff's

employment. Young's affidavit at 2 (doc. 50-3). Defendant "decided to terminate the

employment of Smith based upon the investigative findings." *Id.* Defendant

"concluded, in particular, that [Plaintiff's] untruthfulness in an official proceeding (the

investigative interviews) compromised his integrity as a corrections officer." *Id.* at 2-3.

　　　Plaintiff was given a copy of the Notice of Proposed Discipline, dated January 4,

2010, which advised him of the findings of the investigation, the General Orders he was

charged with violating, and the recommendation that Plaintiff's employment be

terminated. Defendant's Ex. H (doc. 50-2 at 95). Plaintiff was "given a hearing before a

predetermination conference board where he was allowed to respond to the proposed

---

　　[9] Plaintiff submitted a copy of General Order 3.0 from the GCSO concerning
disciplinary procedures and disciplinary standards, approved by the Defendant on
March 2, 2009. Doc. 57-2 at 57-86. Pursuant to that Order, discipline for the first
occurrence of a level five violation is dismissal. *Id.* at 84.

termination and the investigation." Young affidavit at 3 (doc. 50-3). "Following the

hearing, the board recommended his termination of employment, and" Defendant

Sheriff Morris Young concurred. *Id.* Defendant said:

> I also considered [Plaintiff's] employment history. He had been terminated from
> Florida State Hospital, when I hired him as a detention officer, and he was
> terminated from the GCSO for job abandonment. I did not intend to give him a
> third opportunity to remain employed.

*Id.*

Defendant Young advised that another employee, William Buckhalt, was

disciplined in October of 2010 for "misusing his position to intimidate a member of the

public." *Id.* at 3. Buckhalt's discipline consisted of being demoted from a narcotics

investigator to a civilian correctional technician, which also resulted in a pay decrease

of approximately $5,000 annually. *Id.*; Doc 57-2 at 14-15. Buckhalt's employment was

not terminated because, unlike Plaintiff, he was not untruthful in the investigation and

had not "previously been separated from the GCSO." Young affidavit at 3 (doc. 50-3).

Indeed, Plaintiff provided evidence that when Buckhalt was disciplined, he had not been

disciplined previously. Doc. 57-2 at 12.

Defendant Young advised that another employee, Barbara Thomas, was

disciplined in October of 2007 when "she flattened the tire of a vehicle owned by a male

whom she had met at a night club." Young affidavit at 3-4 (doc. 50-3). The discipline of

Thomas was not explained in the Defendant's affidavit, but Defendant clarified that,

unlike Plaintiff, Thomas was not untruthful in the investigation, nor had she "been

previously terminated from the GCSO." *Id.* at 4. Plaintiff submitted evidence showing

that Thomas was "suspended for three days without [pay] and placed on a probationary status for six months."  Doc. 57-2 at 23.

Defendant Young explained that he "selected Angie Galloway for the school resource officer position" in September 2008, and Leroy Garrison, John Hodges, Cecil Morris, and David Ganious were selected for the positions of bailiff in May of 2009 because of their previous law enforcement experience.  *Id.* at 2.  Defendant Young said that Plaintiff's "experience was primarily related to corrections and he was not as qualified" as the persons selected for the other positions.  *Id.*

Presnell was unaware that Plaintiff had made a complaint of discrimination until the "notice of filing the charge was provided to the GCSO and was brought to [her] attention in July, 2010."  Presnell affidavit at 3 (doc. 50-4 at 3).  She states in her affidavit that she was unaware of an any such complaint being made by Plaintiff "while he was employed at the GCSO."  *Id.*

**Plaintiff's affidavits**

As noted above, Plaintiff submitted a large stack of documents, unorganized in any meaningful way, in response to the summary judgment motion, but he failed to submit a statement of facts, citing to evidentiary materials, and pointing to a genuine issue of material fact which must be tried.  N.D. Fla. Loc. R. 56.1(A).  Despite those deficiencies, Plaintiff submitted several affidavits which have been examined to ensure a fair review, although the Court has not reviewed the multitude of documentary exhibits to which Plaintiff has not mentioned, cited, or pointed to in response to summary judgment.

As for Plaintiff's affidavits, the affidavit submitted on February 8, 2013, is not relevant to the events at issue in this case.  Doc. 58.  Instead, Plaintiff's affidavit concerns recent events in which he contends his opposition to summary judgment is late because he was attacked by a masked person whom he believes to be an employee of the GCSO.  *Id.*  That is irrelevant to the claims concerning Plaintiff's employment and termination from GCSO.

Plaintiff also submitted several documents which he titled, "sworn statement," in his response.  Doc. 57.  All of Plaintiff's statements, however, are inadmissible in their present form.  Although Plaintiff states at the beginning of those statements "Willie B. Smith do swear," the statements are not made under penalty of perjury, do not purport to attest to the truth of the statements, and do not comply with 28 U.S.C. § 1746.[10] These statements also do not meet the requirements of Rule 56(c) that an affidavit "be made on personal knowledge" and "show that the affiant or declarant is competent to testify on the matters stated."  FED. R. CIV. P. 56(c)(4).  Notwithstanding this defect, the Court has an obligation to allow the parties to remedy obvious defects in summary judgment materials, although the Court is not required or permitted to become counsel

---

[10] The statute provides: "Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form: . . .  (2) If executed within the United States, its territories, possessions, or commonwealths: 'I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)'."  28 U.S.C. § 1746.

to a litigant, even one who proceeds *pro se*.  Griffith v. Wainwright, 772 F.2d 822, 825,

n. 6 (11th Cir. 1985), *citing* Barker v. Norman, 651 F.2d 1107, 1128-29 & n. 26 (5th Cir.

Unit A 1981).  Should Plaintiff correct the deficiencies in the various declarations by

clearly and asserting to the truth of the statements and his competence to testify, his

declarations provide the following relevant facts.

Plaintiff contends that when Presnell requested Rowan, a white male, to

investigate the complaint against him, it was "discrimination and retaliation."  Doc. 57 at

3.  That is a conclusory assertion and Plaintiff's statement provides no facts to support

the legal conclusion Plaintiff reached.

Plaintiff asserts that he began his leave of absence on January 29, 2007, but

when he returned on May 31, 2007, he found out that Ann Presnell "had terminated"

Plaintiff's employment "and reported to FDLE that this was an administrative

termination, not involving misconduct."  Doc. 57 at 5.  Plaintiff said that Defendant

would not give him credit for the time he was absent from work, but "placed me back to

work and advised me that he was having staff to remove the administrative termination,

no [sic] involving misconduct and correcting my employment history to reflect a

voluntary separation, not involving misconduct."  *Id.*  Plaintiff also claimed that Presnell

retaliated against him by making up a "false disciplinary charge of Job Abandonment."

*Id.* at 5-6.  This evidence does not create a dispute of material fact because Plaintiff

admits that he did not return from his leave of absence until May 31, 2007, and it is

undisputed that Plaintiff's request for time off was only through October 31, 2006.  It is

undisputed that Plaintiff was originally terminated for Job Abandonment, although

Plaintiff was permitted to return to work.  Plaintiff's official record reflects there was no

misconduct.  Moreover, these events took place prior to August 28, 2009, and are barred.

Plaintiff also said that he "filed charges against" Presnell and Major James Morgan on October 7, 2009.[11]  Doc. 57 at 5.  That statement alone is insufficient because there are no facts to explain how Plaintiff filed charges, what the charges concerned, or most importantly, that Presnell or Morgan were aware that Plaintiff filed some type of charge against them.  Plaintiff's additional statement concerning the differences in handling of investigations provides no statement showing personal knowledge and does not show that Plaintiff would be competent to testify on the matters stated therein.  Doc. 57 at 8-9.  It is, thus, insufficient pursuant to FED. R. CIV. P. 56(c)(4).

Plaintiff's affidavit concerning statements made to him by Ms. Person essentially challenges the findings made by Investigator Rowan.  Doc. 57 at 11.  A self-serving affidavit which presents "'discredited testimony is not [normally] considered a sufficient basis for drawing a contrary conclusion.'"  Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 512, 104 S.Ct. 1949, 1966, 80 L.Ed.2d 502 (1984), *quoted in* Anderson v. Liberty Lobby, Inc., 477 U.S. at 256-257, 106 S.Ct. at 2514.  Plaintiff's affidavit presents hearsay statements from Ms. Person and provides no evidentiary

---

[11] Moreover, the evidence reveals that on October 7, 2009, Plaintiff submitted a letter addressed to the Defendant, Sheriff Morris Young, Major James Morgan, Lieutenant Levon Jackson, and Mrs. Ann Marie Presnell (the Human Resources Manager of the GCSO).  Defendant's ex. 15 (doc. 50-2 at 19); Plaintiff's ex. H (doc. 57-1 at 31).  Plaintiff generally complained in the letter that while applying for a Road Deputy position, he was "unethically placed in the position of a new recruit" and had been "requested by personnel to undergo interviews and test along with 22 perspective employees."  *Id.*  The letter does not make a complaint or assert a charge of discrimination against Presnell or Morgan.

support for those statements, but simply claims that Plaintiff "did not give false information to Investigator Matt Rowan" and "did not misuse [his] official position" and "did not intimidate" Ms. Person.  It is well established that "conclusory allegations without specific supporting facts have no probative value."  Evers v. General Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985), quoted in Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1217 (11th Cir. 2000).  Thus, one cannot oppose summary judgment with a self-serving, conclusory affidavit that fails to set forth specific facts to show why there is an issue for trial, and fails to demonstrate that the facts presented in the affidavit are based on personal knowledge beyond mere speculation or belief.  Leigh, 212 F.3d at 1217, citing Gossett v. Du–Ra–Kel Corp., 569 F.2d 869, 872 (5th Cir. 1978); see also Fed. R. Civ. Proc. 56(e); Wane v. Loan Corp., — F.Supp.2d —, 8:11cv2126, 2013 WL 672574, at *10 (M.D. Fla. Feb. 23, 2013) (finding plaintiffs did not support their action "with any evidence beyond self-serving affidavits and mere bluster.").  Plaintiff's self-serving affidavit, which is not properly attested, does not create a genuine dispute of fact concerning the claims at issue in this case.

**Analysis**

**Retaliation**

A retaliation claim brought pursuant to Title VII is analyzed under the *McDonnell Douglas* burden-shifting framework.  Brown v. Ala. Dep't of Transp., 597 F.3d 1160, 1181 (11th Cir. 2010); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).  First, Plaintiff must establish a prima facie case, which raises a presumption that the employer's decision was, more likely than not, based on an impermissible factor.  Richardson v. Leeds Police Dept., 71 F.3d 801,

805 (11th Cir. 1995).  To establish a prima facie case of Title VII retaliation, Plaintiff

must show that (1) he engaged in statutorily protected activity; (2) he suffered a

materially adverse employment action; and (3) there was a causal link between the two.

Butler, 536 F.3d at 1212; Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th

Cir. 2001), *cited in* Dixon v. The Hallmark Companies, Inc., 627 F.3d 849, 856 (11th Cir.

2010).  If a plaintiff establishes a prima facie case, the burden shifts to the

defendant-employer to articulate a legitimate, non-discriminatory reason for its action.

Richardson, 71 F.3d at 805.  If the employer carries this burden, the plaintiff must

persuade the trier of fact that the employer's proffered reasons are a pretext for

discrimination.  *Id.* at 806.  Mere conclusory allegations are not sufficient to show that

the employer's proffered reasons are pretextual.  Earley v. Champion Intern. Corp., 907

F.2d 1077, 1081 (11th Cir. 1990).

Defendant argues that Plaintiff has not demonstrated a prima facie case.  Doc.

49 at 16.  It is apparent that Plaintiff contends his October 7, 2009, letter to the Sheriff

and other persons concerning the requirement that he take a test and be treated the

same as new recruits is his "protected activity."  Defendant's ex. 15 (doc. 50-2 at 19).

Plaintiff requested that he be permitted "to move into the positions of Road Deputy

without competing with new recruits."  *Id.*  Defendant contends that the letter does not

constitute "protected activity" because it did not assert to the employer that Plaintiff was

complaining about discrimination based on sex, race, national origin, or some other

protected class.  Doc. 49 at 16.  The Seventh Circuit has concluded that "[m]erely

complaining in general terms" about some perceived unfairness or "general

displeasure" with a condition of employment is insufficient to constitute protected

activity to support a claim of retaliation. <u>Tomanovich v. City of Indianapolis</u>, 457 F.3d 656, 663 (7th Cir. 2006), *relying on* <u>Gleason v. Mesirow Fin., Inc.</u>, 118 F.3d 1134, 1147 (7th Cir. 1997). The general rule in the Eleventh Circuit is that a plaintiff engages in statutorily protected activity when he opposes an employment practice that he has a good faith, reasonable basis to believe is unlawful. <u>Butler v. Ala. Dep't of Transp.</u>, 536 F.3d 1209, 1213 (11th Cir. 2008). Here, Plaintiff did not submit a letter complaining about an employer practice or requirement that Plaintiff had a reasonable basis to believe was unlawful. Plaintiff undeniably felt the interview and testing requirements were unfair to him as a current employee of GCSO, but he does not assert there was anything unlawful about the requirement. Rather than a letter of complaint, Plaintiff's letter is viewed more as a request to be permitted to bypass the testing requirements. Moreover, Plaintiff did not complain about Presnell or Morgan such that they would have a basis to retaliate against him, rather, he complained to them, along with the Sheriff and several other persons, about a policy he perceived as unfair. That is insufficient to present a prima facie case of discrimination. Finally, even if the letter were accepted as statutorily protected activity, Plaintiff has not shown any causal connection between that letter and his termination. Summary judgment should be granted in Defendant's favor on the retaliation claim.

**Failure to Promote**

Plaintiff also claimed discrimination when he was not hired as a deputy sheriff on or about September 17, 2009. To establish a prima facie case of a failure to promote, a Title VII plaintiff must show: 1) that he belongs to a protected class; (2) that he was qualified for the job; 3) that, despite his qualifications, he was rejected; and 4) after

being rejected, the employer either filled the position with a person outside of the plaintiff's protected group or continued to seek applicants. Freeman v. Koch Foods of Alabama, 777 F.Supp.2d 1264, 1282 (M.D. Ala. 2011) (other citations omitted). The evidence in this case reveals that the Defendant issued General Order 1.0(7) which required a minimum score of 70% on a written exam measuring knowledge or competence. Plaintiff scored a 59, which was not a passing score and, therefore, he was not qualified for the position of deputy sheriff. Summary judgment should be granted in Defendant's favor on this claim.

**Termination**

The remaining claim is that Plaintiff's termination from the Sheriff's Office was due to discrimination. As was the case with the retaliation claim, the *McDonnell Douglas* burden-shifting framework is used to evaluate a claim of discrimination. Essentially, Plaintiff must establish a prima facie case which generally requires him to show: 1) the plaintiff was a member of a protected class, 2) he was qualified to do the job, 3) he was subjected to an adverse employment action, and 4) similarly situated employees outside of the protected class were treated differently. Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1091 (11th Cir. 2004), *cited in* Holland v. Gee, 677 F.3d 1047, 1055 (11th Cir. 2012). Once Plaintiff presents a prima facie case, the defendant must come forward and show "a legitimate, nondiscriminatory reason for its actions." Holland, 677 F.3d at 1055. Thereafter, the burden shifts back to the plaintiff "to demonstrate that the proffered reason was not the true reason for the employment decision." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981), *quoted in* Holland, 677 F.3d at 1055.

Here, Defendant has come forward with evidence to show that there was a legitimate, non-discriminatory reason to terminate Plaintiff's employment and that similarly-situated persons outside of Plaintiff's protected class were not treated more favorably. Defendant's evidence revealed that two persons, Christopher Person and his mother, Roseanne Person, contacted the GCSO inquiring about Plaintiff's employment initially, but disclosing a concern that Plaintiff was in Miami, in uniform, wearing his firearm, and attempting to intimidate Ms. Person concerning Plaintiff's desire to have a refund on the vehicle he had purchased from her. The allegations were serious enough that an internal investigation was initiated.

In the course of the investigation, Plaintiff was not truthful with investigator Rowan. First, Plaintiff gave a sworn statement admitting that he wore his uniform and gun when he went to Miami, but he said he wore a jacket on the bus to cover his uniform and gun. That statement was false because the Greyhound Bus station video revealed Plaintiff had put on a red shirt before boarding the bus, and he was carrying a duffel bag. Second, Plaintiff said that he never had a conversation with any of the Persons concerning having the car towed, which was contrary to what Mrs. Person told investigator Rowan.[12]

Notwithstanding the inconsistencies of Plaintiff's story, it is apparent that Plaintiff was seeking to intimidate a citizen by wearing his uniform. Plaintiff did not work the entire day and could have taken off his uniform prior to traveling on a bus for over 500

---

[12] Ms. Person said that Plaintiff had called her in the middle of the night to tell her that the car he had just purchased had broken down, and that Plaintiff did not accept her offer to pay to have the car towed back to her home since he was still in the south Florida area, and she would refund him the money he paid to purchase the car.

miles. Plaintiff could have gone home to change clothes after buying the bus ticket and before boarding the bus, but he went to Firehouse Subs. Plaintiff was not truthful about when he took off the red shirt and displayed his uniform shirt. Plaintiff first claimed he changed clothes while on the bus nearing Miami. He then changed his story when confronted about passengers being checked with a wand to see if they are carrying metal objects on their person and said he put his uniform shirt and gun-belt back on after getting off the bus and into a taxi cab to go to the Person's residence. Under either version, it is apparent that Plaintiff intentionally went to the Miami area with his uniform and gun belt in an effort to intimidate a citizen into refunding him money. As alleged by the victim, there was simply "no other reason for him to wear a uniform all the way to Miami." Plaintiff was found to have committed "level five" violations and the appropriate discipline under the GCSO's guidelines is termination. Defendant provided a valid and legitimate reason to have terminated Plaintiff's employment.

In response, Plaintiff has come forward with no evidence to demonstrate that the Defendant's reason is a mere pretext. Plaintiff has pointed to no other persons who had Plaintiff's prior disciplinary record who were treated more favorably when level five violations were sustained. Plaintiff has disputed that he was previously terminated for Job Abandonment, but Plaintiff failed to present any evidence to show that Defendant did not terminate his employment when he failed to return to work. Plaintiff admitted that he did not return until May of 2007, although his leave request was only through October 31, 2006. Defendant's unrebutted evidence shows that Plaintiff's employment was terminated in January of 2007 but Defendant thereafter agreed to allow Plaintiff to submit a letter of resignation for FDLE's records, but agency records of the GCSO were

never rescinded. Plaintiff has not come forward with any evidence to show that any

persons outside his protected class were treated more favorably. Therefore,

Defendant's motion for summary judgment as to the discrimination claim should be

granted as well.

In light of the foregoing, it is respectfully **RECOMMENDED** that Defendant's

motion for summary judgment, doc. 49, be **GRANTED** and judgment entered in

Defendant's favor on all claims.

**IN CHAMBERS** at Tallahassee, Florida, on March 6, 2013.


S/    Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 14 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.